William D. Marler, Esq., WSBA #17233
MARLER CLARK. L.L.P., P.S.
1301 Second Avenue, Suite 2800
Seattle, WA  98101
Phone: 206-346-1888
Fax: 206-346-1898
Email: bmarler@marlerclark.com

Attorneys for plaintiff

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# SEATTLE DIVISION

| | |
|---|---|
| TIMOTHY KNIFFIN, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br>a Delaware Corporation,<br><br>　　　　Defendant.<br>_____ | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND** |

COMES NOW the plaintiff, Timothy Kniffin, ("plaintiff") by and through his undersigned attorneys of record, asserting claims against the defendant, Chipotle Mexican Grill, Inc., a Delaware Corporation, ("defendant"), and states and alleges as follows:

## I.　　PARTIES

1.　　The plaintiff is a resident of Seattle, Washington, and is thus, a citizen of the state of Washington for purposes of diversity jurisdiction.

2.　　The defendant, Chipotle Mexican Grill, Inc., is a corporation organized and existing under the laws of Delaware, with its registered agent at 160 Greentree Dr. Ste. 101

Dover, Delaware. Chipotle, together with its subsidiaries (collectively the "Company") is, therefore, a citizen of the state of Delaware for purposes of diversity jurisdiction.

3. The Company develops and operates fast-casual, fresh Mexican food restaurants. As of June 30, 2015, the Company operated over 1,900 Chipotle restaurants throughout the United States and other countries.

4. At all times relevant to the allegations in this complaint, the Company was registered to do business, and did conduct business, in the State of Washington.

## II.   JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy far exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the defendant has certain minimum contacts with the State of Washington such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

6. Venue in the United States District Court for the Western District of Washington is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or omissions giving rise to the plaintiff's claims and causes of action occurred in this judicial district, and because the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III.   GENERAL ALLEGATIONS

**Chipotle *E. coli* O157:H7 Outbreak**

7. In or around the end of July 2015, the Chipotle restaurant located at 1415 Broadway, Seattle, Washington, which restaurant was, at all times relevant, owned and operated by the defendant, was the source of an *E. coli* O157:H7 outbreak that sickened at least five

people, including the plaintiff.

8. Officials with the Seattle-King County Public Health Department concluded that the source of the genetically indistinguishable *E. coli* O157:H7 illnesses was food prepared and sold by the defendant at this restaurant location.

**Prior Chipotle Foodborne Illness Outbreaks**

9. In September 2015, Minnesota Department of Health and Minnesota Department of Agriculture investigators reported an outbreak of *Salmonella* Newport among customers of 17 different Chipotle restaurants located primarily in the Twin Cities metro area, with one in St. Cloud and one in Rochester. Meal dates ranged from August 16 to August 28, 2015. Illness onset dates occurred between August 19 and September 3. As of September 16, 2015, there were 64 outbreak-associated cases. Nine persons required hospitalization.

10. In August 2015, Ventura County Environmental Health and Ventura County Public Health Division staff investigated an outbreak of Norovirus among patrons of a Chipotle restaurant located in the Simi Valley Towne Center. During the week of August 18, 2015, about 300 customers and 18 restaurant employees reported symptoms. Laboratory testing of patient specimens confirmed the presence of Norovirus.

11. In September 2009, a cluster of patients who had been infected with an indistinguishable strain of *E. coli* O157:H7 was identified. Initially case-patients were identified in Colorado, Utah, and New York State. The Colorado case-patients had all eaten at the same Chipotle Restaurant in Boulder, Colorado, on September 4, 2009. In Utah, all case-patients had eaten at the Cafe Rio Restaurant located in Salt Lake City, Utah, between August 31 and September 4, 2009. The New York State case patient had similarly eaten at a Chipotle Restaurant. A case control study involving Utah and Colorado case-patients found that eating

romaine or iceberg lettuce was associated with risk of illness.

12. In April 2008, patrons of a Chipotle Grill Restaurant near Kent State University in Kent, Ohio, developed diarrhea, nausea and vomiting due to Norovirus. Many of those affected were Kent State University students who had eaten burritos at Chipotle. Restaurant coupons were given in exchange for donating blood, which resulted in a large number of exposures and illnesses.

13. In March 2008, persons who dined at the Chipotle restaurant located in La Mesa, California, between March 1 and April 22, 2008, developed hepatitis A. Restaurant employees were tested for hepatitis A subsequent to the outbreak and had no evidence of recent hepatitis A infection. No food source for the outbreak was definitively determined.

### *E. coli* O157:H7

14. *E. coli* O157:H7 is one of hundreds of strains of the bacterium *Escherichia coli*. Most strains of *E. coli* are harmless and live as normal flora in the intestines of healthy humans and animals. The combination of letters and numbers in the name of *E. coli* O157:H7 refers to the specific markers found on the bacterium's surface; these letters and numbers distinguish the dangerous O157:H7 variety from other types of *E. coli.*

15. According to a recent study, an "estimated 73,480 illnesses due to *E. coli* O157:H7 infections occur each year in the United States, leading to an estimated 2,168 hospitalizations and sixty-one deaths." The hemorrhagic colitis caused by *E. coli* O157:H7 is characterized by severe abdominal cramps, diarrhea that typically turns bloody within twenty-four hours, and sometimes fevers. The typical incubation period—which is to say the time from exposure to the onset of symptoms—in outbreaks is usually reported as three to eight days. Infection can occur in people of all ages but is most common in children. The duration of an

uncomplicated illness can range from one to twelve days. In reported outbreaks, the mortality rate is 0-2%, but can run as high as 16-35% in outbreaks involving nursing homes or the elderly. The elderly, along with the very young, frequently suffer more severe illness related to *E. coli* O157:H7 infection than other populations.

16. *E. coli* O157:H7 infections can lead to a severe, life-threatening complication called hemolytic uremic syndrome ("HUS"). HUS accounts for the majority of the chronic illnesses and deaths caused by the bacteria. It occurs in two to seven percent of victims, primarily children, with onset five to ten days after diarrhea begins, and it is the most common cause of renal failure in children. Approximately half of the children who suffer HUS require dialysis, and at least five percent of those who survive have long-term renal impairment. The same number suffers brain damage. Although somewhat rare, serious injury to the pancreas, resulting in death or the development of diabetes, can also occur. There is no cure or effective treatment for HUS.

**The Plaintiff's Illness**

17. On or about July 25 and 27, 2015, Timothy Kniffin purchased and consumed pork carnitas with white rice; salsa, peppers, guacamole and chips at the defendant's restaurant located at 1415 Broadway, Seattle, Washington. The food that Mr. Kniffin purchased and consumed on one or both dates was contaminated by *E. coli* O157:H7.

18. On or about July 29, 2015, Mr. Kniffin began to suffer from gastrointestinal symptoms, including nausea, diarrhea, abdominal cramps, fevers, and severe body aches. Shortly after the onset of these symptoms, Mr. Kniffin's repeated bouts of diarrhea turned bloody.

19. On or about July 30, 2015, Mr. Kniffin sought medical treatment at Virginia

Mason Medical Center in Seattle. He would remain hospitalized through August 2, 2015, at which point he was discharged from the hospital but continued to suffer from symptoms of his severe gastrointestinal illness.

20. During his hospitalization, Mr. Kniffin submitted a stool specimen that ultimately tested positive for *E. coli* O157:H7. Further genetic testing by pulsed field gel electrophoresis done by the State of Washington Public Health Laboratory showed that Mr. Kniffin's bacterial isolate was genetically indistinguishable from the other 4 outbreak cases.

21. Mr. Kniffin suffered from ongoing gastrointestinal symptoms, as well as fatigue and lethargy, for weeks after being discharged from the hospital. He has incurred substantial medical expenses and wage loss, as well as physical and emotional injuries, all proximately caused by his ingestion of *E. coli* O157:H7-contaminated food at defendant's restaurant in July 2015.

## IV.   CAUSES OF ACTION

### Strict Liability—Count I

22. The defendant was, at all times relevant to this Complaint, the manufacturer and seller of the adulterated food product that is the subject of this action.

23. The adulterated food product that the defendant manufactured, distributed, and sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli*, a deadly pathogen.

24. The adulterated food product that the defendant manufactured, distributed, and sold was delivered to the plaintiff without any change in its defective condition. The adulterated food product that the defendant manufactured, distributed and sold, was used in the manner expected and intended, and, as such, was consumed by the plaintiff.

25. The defendant owed a duty of care to the plaintiff to design, manufacture, and sell, a food product that was not adulterated, which was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendant breached this duty.

26. The defendant owed a duty of care to the plaintiff to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The defendant breached this duty.

27. As a direct and proximate result of the defendant's manufacture, distribution, and sale of a defective product in an unreasonably dangerous condition, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### Breach of Warranty—Count II

28. The defendant is liable to the plaintiff for breaching express and implied warranties that it made regarding the adulterated food product that caused the plaintiff's injuries.

29. These express and implied warranties included the implied warranties of merchantability and fitness for a particular purpose, and the express warranty, through its sale of food to the public, and by the statements and conduct of its employees and agents, that the food product it prepared and sold to the plaintiff was fit for human consumption, and not otherwise adulterated or injurious to health.

30. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

31. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him was not fit for the purposes intended—*i.e.* human consumption—and that this food

product was therefore in breach of the implied warranty of fitness for its intended purpose.

32.   As a direct and proximate cause of the defendant's breach of warranties, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### **Negligence—Count III**

33.   The defendant owed the plaintiff a duty to use reasonable care in the manufacture, distribution, and sale of its food product. Compliance with this duty would have prevented or eliminated the risk that the defendant's food products would become adulterated with *E. coli*, or any other dangerous pathogen. The defendant breached this duty and, was therefore, negligent.

34.   The defendant had a duty to properly supervise, train, and monitor its respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products. The defendant breached this duty and, was therefore, negligent.

35.   The defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances and regulations, and that were clean, free from adulteration, and safe for human consumption. The defendant breached this duty and, was therefore, negligent.

36.   As a direct and proximate result of the defendant's acts of negligence, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### **Negligence Per Se—Count IV**

37.   The defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq*.), and the

Washington adulterated food statutes.

38. The plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, and safety codes or provision pertaining to the manufacture, distribution, storage, and sale of food products.

39. The defendant failed to comply with the provisions of the health and safety acts identified above and, as a result, was negligent *per se* in its manufacture, distribution, and sale of a food product adulterated with *E. coli*, a deadly pathogen.

40. As a direct and proximate result of conduct by the defendant that was negligent *per se*, the plaintiff sustained injury and damages in an amount to be determined at trial.

## V.     DAMAGES

41. The plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the defendant, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to damages for: general pain and suffering, past and future; loss of enjoyment of life, past and future; medical and medical related expenses, past and future; travel and travel-related expenses, past and future; emotional distress, past and future; pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays for judgment against defendant as follows:

A. Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiff as a result of the defendant's conduct;

B. Ordering statutory prejudgment interest;

C. Awarding plaintiff reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

D. Granting all such additional relief as this Court deems just and equitable.

DATED: December 28, 2015

       MARLER CLARK, L.L.P., P.S.

       /s/ William D. Marler
       William D. Marler, Esq., WSBA # 17233
       Attorneys for Plaintiff
       1301 Second Avenue, Suite 2800
       Seattle, WA 98101
       Telephone: 206-346-1888
       bmarler@marlerclark.com